# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RANDALL W. SYLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 12-cv-01408 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| COUNTY OF WILL, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Randall Syler, a prisoner now in the custody of the Illinois Department of Corrections, claims that Defendant Will County and certain of its correctional officers and contract medical care providers[1] violated his Eighth Amendment right to be free from cruel and unusual punishment while he was being held at the Will County Adult Detention Facility ("WCADF"). Specifically, Syler claims that Defendants acted with deliberate indifference towards his serious medical condition of a ruptured testicle. Defendants deny Syler's claim and assert as an affirmative defense that he failed to exhaust his administrative remedies before filing suit. After conducting an evidentiary hearing as provided by *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), the Court concludes that Syler indeed failed to exhaust his administrative remedies and thus dismisses this case without prejudice.

---

[1] Syler has sued Will County; Will County Sheriff Paul Kaupas; correctional officers Sione Martel, Timothy Quigley, and Dan Herod; Correct Care Solutions LLC ("Correct Care"); and Correct Care employees Jesse Horton and Wendy Hackler.

## BACKGROUND

### I. The Injury

On September 9, 2009, Syler was booked at the WCADF, given an Inmate Handbook, and assigned a top bunk. Approximately one year later, on August 30, 2010, Syler suffered an injury upon falling from his bunk. Over the next day or so, Syler informed various medical staff and correctional officers that he was experiencing pain and other symptoms—such as swelling, nausea, and difficulty standing up and walking—because of the fall. On the afternoon of September 1, 2010, a doctor examined Syler and found his left testicle to be grossly enlarged, a sign of testicular trauma. Syler was then transferred to Silver Cross Hospital, where he was diagnosed with a testicular rupture and underwent emergency surgery. On September 4, 2010, Syler returned from the hospital to the WCADF, where he was temporarily housed in the medical unit to recover from his surgery. Eventually, on November 30, 2010, Syler was transferred from the WCADF into the custody of the Illinois Department of Corrections and housed at Menard Correctional Center ("Menard").

### II. The Lawsuit

Syler filed the present lawsuit on February 28, 2012. (Dkt. No. 1.) On January 8, 2013, the district judge initially assigned to Syler's case dismissed his claims for failure to exhaust administrative remedies. (Dkt. No. 43.) On appeal, the Seventh Circuit vacated the district court's dismissal and remanded the case for further proceedings. On remand, the case was reassigned to this Court. (Dkt. No. 90.) After reassignment, this Court recruited pro bono counsel to represent Syler. The parties then proceeded to conduct extensive discovery and motion practice limited to the exhaustion issue. This was followed by a two-day *Pavey* hearing to determine whether Syler properly exhausted his administrative remedies.

### III. The Pavey Hearing

The *Pavey* hearing began on January 29, 2019 and, due to scheduling issues at the facility where Syler is being held, was subsequently continued to and concluded on March 14, 2019. Syler was represented by counsel at the hearing. Three witnesses testified: retired WCADF Classification Sergeant Mary Bridget Graham, Syler, and Syler's mother, Deborah Syler Spencer.

Defendants called Sergeant Graham as their first witness. She testified that the WCADF has a formalized grievance process. (*See also* WCADF Policy and Procedure, Pl.'s Ex. 3.) According to Sergeant Graham, the WCADF provides inmates with a blank worksheet called the "Form 22" for submission of written grievances. Form 22 is a triplicate form consisting of an original white copy, a pink carbon copy, and a yellow carbon copy. After filling out the form, the inmate keeps the pink copy, and the white and yellow copies are submitted to the classification office. There, a classification sergeant such as Graham stamps the grievance with the date, assigns it a number, and logs it in the record book before forwarding it to the appropriate department—in Syler's case, the medical department. After a staff member in the appropriate department reviews the grievance, he or she provides a written response on the Form 22. The original white copy is then added to the inmate's classification file, and the yellow copy reflecting the response is returned to the inmate.

According to the WCADF's records, Syler filed a grievance relating to his testicular rupture on September 22, 2010 ("September 22 Grievance"), but in that grievance he complains only about a $10 co-pay charge he was required to pay. (Pl.'s Ex. 6.) The September 22 Grievance contains Syler's written narrative summarizing his complaint and is stamped "RECEIVED OCT 13 2010." It also shows a note from Sergeant Graham on September 24,

2010, stating that the grievance was forwarded to the medical director, and a staff response on September 28, 2010, indicating that Syler's $10 co-pay charge would be reimbursed. The WCADF also has a copy of another Form 22 that Syler filed on November 3, 2010 ("November 3 Grievance"), in which he states that he did not receive a response to the September 22 Grievance. The November 3 Grievance does not reference any other pending grievances. Like the September 22 Grievance, the November 3 Grievance contains Syler's written narrative summarizing his complaint, a handwritten notation "Rcd [Received] 11-9-10," a note from Sergeant Graham on November 8 stating that the grievance was forwarded to the medical director, and a staff response on November 11 confirming that the $10 co-pay charge was reimbursed. Moreover, the WCADF's grievance log reflects receipt of both the September 22 Grievance and the November 3 Grievance. (Pl.'s Ex. 7.)

Syler was the second witness to testify at the *Pavey* hearing. Syler testified that he did not know he had to exhaust his administrative remedies prior to filing suit. Yet he also claims that, on September 10, 2010, he submitted a written grievance ("September 10 Grievance") complaining about the conduct of the correctional officers and medical staff with respect to his testicular injury. Specifically, on September 4, 2010, after he returned to the WCADF from the hospital where he had undergone testicular surgery, Syler was placed in the medical unit. According to Syler, he was "immobile" and "bedridden" for the entire next week. Syler also claims that while he was recovering in the medical unit, he obtained a blank grievance form from either a nurse or another inmate and filled out the September 10 Grievance. In addition, he obtained two additional blank sheets of lined paper from another inmate, which he used to write additional statements expounding on the September 10 Grievance.

4

Syler further testified that during the same time period, as he was recovering from surgery, he was taking pain medication in the form of either "Vicodins or Norcos." Syler claims that he prepared the September 10 Grievance in the evening after taking his medication. He admitted that he was "high or something, off [his] Vicodins" at the time, "because [he] couldn't deal with the pain." Syler clarified that he did not believe the drugs inhibited his memory but analogized himself to a "drunk driver [who] believes they're sober." Ultimately, Syler testified that it took him six hours over a two-day period to complete the grievance form and additional two pages, which he then placed "in the door crack" of his cell in the medical unit. Syler claims that he was able to reach the door crack of his cell from his bed without standing up. Despite those efforts, according to Syler, he never received a response from any member of the WCADF staff.

During his testimony, Syler admitted that he was familiar with the WCADF's grievance procedures on September 10, 2010 and that, when he filed grievances on other occasions, he kept the pink copy of the Form 22 as instructed by the Inmate Handbook. Syler also claims that on September 10, he submitted the white copy of the grievance and kept both the yellow and pink copies. Syler testified that he later gave the yellow and pink copies of the September 10 Grievance to his mother when he was transferred from the WCADF to Menard. His mother then turned over both copies of the September 10 Grievance to his attorney at the time, Kevin Bugos. By the time of the *Pavey* hearing, however, neither Syler nor Bugos had possession of the pink copy; only the yellow copy was accounted for. Syler attributes the unexplained disappearance of the pink copy to Bugos.

Syler's yellow copy of the September 10 Grievance does not show any notes from a classification sergeant or any staff response. The WCADF's grievance log does not reflect

receipt of the September 10 Grievance. (Pl.'s Ex. 7.) Syler admitted at the *Pavey* hearing that he did not file an appeal with respect to the September 10 Grievance, nor did he file a second Form 22 to follow up on the alleged lack of response from the WCADF. Syler claims he did not know that he could take such steps to follow up on a grievance. To support the existence of the September 10 Grievance, Syler offered into evidence a letter he wrote to the Sheriff of Will County dated August 8, 2011, in which Syler claims that he submitted a grievance on September 10, 2010. (Pl.'s Ex. 5.) Sergeant Graham wrote back in response to Syler's correspondence, indicating that the WCADF did not have any record of the September 10 Grievance and that the only grievance the WCADF found relating to Syler's testicular injury was the September 22 Grievance. (Pl.'s Ex. 6.) Syler did not follow up with Sergeant Graham after that point.

Finally, Syler's mother, Deborah Syler Spencer, testified that upon Syler's transfer to Menard, she went to the WCADF and picked up all records and documents he accumulated during his time there. (*See* Pl.'s Ex. 10.) Spencer recalled that the September 10 Grievance was included in those documents, along with several blank Form 22's. She claimed that she eventually handed over Syler's WCADF documents and records to Bugos, including the pink and yellow copies of the September 10 Grievance. At the hearing, Defendants confronted Spencer with her prior deposition testimony in this matter, in which she stated that after Syler was transferred from the WCADF to Menard, he mailed her a package containing the yellow copy of the September 10 Grievance.

## DISCUSSION

### I.     Legal Standard

The Prison Litigation Reform Act ("PLRA") requires prisoner plaintiffs to exhaust their administrative remedies prior to filing suit in federal court. *See* 42 U.S.C. § 1997e(a). The

"benefits of exhaustion . . . include allowing a prison to address complaints about the program it administers before being subject to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007). "[U]nexhausted claims are procedurally barred from consideration." *Pyles v. Nwaobasi*, 829 F.3d 860, 869 (7th Cir. 2016). Failure to exhaust properly under the PLRA is an affirmative defense that Defendants must prove by a preponderance of the evidence. *See Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016) ("Failure to exhaust is an administrative defense, and Defendants have the burden of proof." (internal quotation marks omitted)); *Williams v. Baldwin*, 239 F. Supp. 3d 1084, 1089 (N.D. Ill. 2017) ("Courts analyze a prisoner's exhaustion under the preponderance of the evidence standard." (internal quotation marks omitted)). And whether a claim has been exhausted pursuant is a determination for a judge—not a jury—to make. *See Pavey*, 544 F.3d at 741–42. The very function of a *Pavey* hearing is to allow the court to consider competing testimony and make resulting credibility determinations. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014) ("A swearing contest requires an evidentiary hearing to resolve . . . ."); *Hicks v. Irvin*, 2011 WL 2213721, at *7 (N.D. Ill. June 7, 2011) ("At the *Pavey* hearing, a judge is empowered to resolve factual disputes pertaining to exhaustion and to make credibility determinations about the witnesses.").

## II. Findings of Fact

At issue in the present case is whether Syler in fact submitted the September 10 Grievance. According to Defendants, Syler fabricated the September 10 Grievance after he discovered that the claims in his lawsuit might be barred for failure to exhaust administrative remedies.

7

The Court first finds that the WCADF had a formalized grievance procedure while Syler was detained at the facility and the grievance procedure was available to Syler during and after his injury in September 2010. Specifically, according to the Inmate Handbook, the WCADF's inmate grievance procedures required an inmate to communicate his grievance to the facility by submitting a completed Form 22. If the inmate was unable to articulate his complaint in writing due to a legitimate physical disability or handicap, he could have requested assistance from the on-duty Pod Deputy and obtained a reasonable accommodation. Inmates were required to submit grievances within 48 hours of the incidents about which they intended to complain; if an inmate missed the deadline, he would have to explain the delay. The WCADF's grievance procedures also required inmates to appeal any unsatisfactory decisions to the Deputy Chief. Moreover, the Court further finds that Syler had a complete and accurate understanding of the grievance procedure—as he utilized it successfully on multiple occasions, including one instance within two weeks of the purported September 10 Grievance.

The Court further finds that Syler's testimony about submitting the September 10 Grievance is simply not credible. Syler offered two conflicting stories regarding the origin of the September 10 Grievance. Initially, he claimed that he submitted the September 10 Grievance by following the procedures in the Inmate Handbook, but the WCADF failed to respond. However, Syler later admitted that he was bedridden and "high" on prescription pain medication on September 10 and that he placed the Form 22 in the door crack of his cell because that was the only procedure available to him at the time. At one point, Syler testified that he submitted the September 10 Grievance on a triplicate form in accordance with WCADF procedure, and he blamed the WCADF for the missing white copy and Bugos for the missing pink copy. Yet Syler also later contended that "neither the [Inmate] Handbook nor Form 22 says that a submission, a

grievance, will be fatal if the wrong color is submitted," suggesting that he may have submitted the wrong color form. Syler's claim that he did not know he could follow up after receiving no response to the September 10 Grievance also undermines his credibility. Syler's testimony is directly controverted by the November 3 Grievance, which reflects exactly that—*i.e.*, his knowledge that he could in fact take affirmative steps to check in on the status of a previously-filed grievance. And the November 3 Grievance does not accuse the WCADF of failing to respond to the September 10 Grievance, even though it was purportedly submitted before the September 22 Grievance about which Syler complained in the November 3 Grievance.

Furthermore, Syler testified that he understands inmates are supposed to keep the pink copy and indeed he had pink copies of other grievances. Yet Syler was unable to explain how or why he only had a yellow copy of the September 10 Grievance and no pink copy. On this issue, Syler relies heavily on his mother's testimony, claiming that she picked up the yellow and pink copies of the September 10 Grievance from the WCADF after Syler was transferred to Menard. But Spencer's testimony at the hearing was not credible either. While Spencer confirmed Syler's version of events, her testimony was impeached: during her deposition, Syler stated that she received the copies of the September 10 Grievance from Syler in the mail ***after*** he had already been transferred to Menard. Similarly, Spencer testified at the *Pavey* hearing that Syler did not discuss his litigation efforts with her, nor did he ask for her assistance. However, Spencer later admitted that Syler called her to say that he planned to mail certain documents to her and instructed her to send the documents to Bugos. Spencer gave conflicting testimony about this phone conversation as well, stating initially that Syler called her from the WCADF but later that he called her from Menard after his transfer. Moreover, although Spencer claimed to recognize the September 10 Grievance, she at first could not recall the color of the page, saying that "[t]t

9

could be yellow, it could be white, it could be pink, it could be purple." Later during the hearing, Spencer inexplicably changed her testimony and recalled that the page was pink. Considering the multiple inconsistencies in Spencer's statements and her bias as Syler's mother, the Court does not credit her testimony. And Syler did not present any testimony from Bugos confirming that he in fact received both a yellow and pink copy from Spencer or that he misplaced the pink copy.

Finally, Syler's yellow copy also looked markedly different than how a yellow copy should. Syler's impressive collection of no less than sixteen other Form 22 submissions all display a stamp or handwritten notation that the grievance was received and the date of receipt, as well as a handwritten staff response addressing the substance of the grievance. All the grievances relating to medical issues also display a note written by the classification sergeant indicating that the grievance was forwarded to the medical director. By contrast, the September 10 Grievance had no stamp confirming receipt, no note from the classification sergeant, and no responsive comments from the medical director or any other department staff member.

In sum, Syler's version of events is that while he was under the influence of heavy pain medication, he submitted the white copy of the September 10 Grievance and two accompanying handwritten pages to WCADF, keeping the yellow and pink copies for his own records. The WCADF never responded to the September 10 Grievance, and Syler never followed up because he did not know he could do so. Upon Syler's transfer to Menard, Spencer picked up the two copies of the September 10 Grievance from the WCADF and later provided them to Bugos.

After considering the evidence, this Court concludes that Syler's story is simply not credible, especially when considered in conjunction with the documents and other evidence provided by Defendants. More likely, Syler did not file a timely grievance about Defendants' conduct in connection with his testicular injury in September 2010. Eventually, months or

perhaps even over a year later, Syler realized his error and created the back-dated September 10 Grievance, which he never actually submitted. Syler then disposed of the white copy and either lost or disposed of the pink copy, leaving him with only the yellow copy in his possession. This explanation accounts for the lack of any other individual's handwriting on the September 10 Grievance, as well as the complete absence of any corroboration regarding the submission of September 10 Grievance. While Syler points to his own August 8, 2011 letter to the Will County Sheriff to support his story, the Court is unpersuaded. After all, Syler easily could have fabricated the August 8, 2011 letter as false proof of the nonexistent September 10 Grievance.

Ultimately, the gaps and inconsistencies in Syler's and Spencer's testimony, on the one hand, and the documentation and testimony presented by Defendants, on the other hand, lead this Court to conclude that Defendants have met their burden of showing that Syler did not exhaust his administrative remedies.

## CONCLUSION

For the foregoing reasons, the Court finds that Syler failed to exhaust his administrative remedies and dismisses this case without prejudice. *See Fluker v. Cty. of Kankakee*, 741 F.3d 787, 791–92 (7th Cir. 2013) ("We have held that dismissals under § 1997e(a) for failure to exhaust must be without prejudice. This is true even if exhausting administrative remedies will prove to be impossible . . . .").

ENTERED:

Dated: June 19, 2019

Andrea R. Wood
United States District Judge